UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Independence-Alliance Party of Minnesota            File No. 22-cv-01231 (ECT/JFD)
and Hugh McTavish,

              Plaintiffs,

v.                                                  **OPINION AND ORDER**

Steve Simon, *in his official capacity as the
Minnesota secretary of state, or his
successor*,

              Defendant.

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, for Plaintiffs
Independence-Alliance Party of Minnesota and Hugh McTavish.

Allen Barr, Office of the Minnesota Attorney General, St. Paul, MN, for Defendant Steve
Simon.

In this § 1983 case, Plaintiffs Independence-Alliance Party of Minnesota and Hugh

McTavish, a Party member and 2022 gubernatorial candidate, assert a First Amendment

challenge to Minn. Stat. § 204B.07, subd. 4.  This statute requires persons who sign a

minor-party candidate's nominating petition to accept an oath attesting that they "do not

intend to vote at the primary election for the office for which this nominating petition is

made."  Plaintiffs claim this requirement unlawfully burdens their First Amendment right

to expressive association.  Plaintiffs seek a preliminary injunction preventing Defendant

Steve Simon, the Minnesota Secretary of State, from enforcing the statute in connection

with any candidacy.  The motion will be denied because Plaintiffs have not shown they are likely to succeed on the merits or that they are likely to suffer irreparable harm.

I

Plaintiff Independence-Alliance Party of Minnesota is a minor political party in Minnesota.  Compl. [ECF No. 1] ¶¶ 4, 8–9; McTavish Decl. [ECF No. 6] ¶¶ 5–6; Fuehrer Decl. [ECF No. 7] ¶¶ 6–7.[1]  The Party "has run at least one candidate for partisan office in each Minnesota general election since 1994," though the Party held "major party" status from January 1995 through December 2014.  Compl. ¶¶ 10, 16; Fuehrer Decl. ¶¶ 8, 14.[2]  Philip Fuehrer, a declarant in this case, is the Independence-Alliance Party's chair, and he has held this position since November 2015.  Compl. ¶¶ 58–59; Fuehrer Decl. ¶¶ 4–5.

Plaintiff Hugh McTavish lives in Washington County, Minnesota, and has been a Party member since February 2022.  Compl. ¶¶ 23–24; McTavish Decl. ¶¶ 2–4.  He plans to run for Minnesota governor this year as the Party's nominee, and the Party plans to support McTavish's candidacy.  Compl. ¶¶ 20–22, 25–28; McTavish Decl. ¶¶ 7–9; Fuehrer Decl. ¶¶ 17–19.  McTavish announced his candidacy on April 7, 2022.  Def.'s Mem. in Opp'n [ECF No. 14] at 2–3 & n.1.

In Minnesota, the process for nominating major political party candidates differs from the process for minor political party candidates.  Compl. ¶¶ 2, 43.  Generally speaking, candidates of major political parties are nominated by primaries, while

---

[1]     It is undisputed that the Independence-Alliance Party is (currently) a "minor political party" as defined in Minn. Stat. § 200.02, subd. 23.

[2]     The term "major political party" is defined in Minn. Stat. § 200.02, subd. 7.

2

candidates of minor political parties, like McTavish, are "nominated by nominating petition as provided in sections 204B.07 and 204B.08."  Minn. Stat. § 204B.03.  The nominating-petition process involves obtaining a required minimum number of signatures on a nominating petition (the number varies depending on the office sought) and timely submitting the petition to the Minnesota Secretary of State.  *See id.* §§ 204B.08, 204B.09. A minor-party candidate has a fourteen-day window to collect signatures on a nominating petition and to submit the petition.  *Id.* § 204B.09, subd. 1.  By statute, the fourteen-day window must occur "not more than 84 days nor less than 70 days before the state primary," and for the 2022 election, this fourteen-day period runs from May 17 to May 31, 2022.  *Id.* § 204B.09, subd. 1(a); Compl. ¶ 53; Fuehrer Decl. ¶ 23.

Among other required information (including, for example, the office sought, the candidate's name and address, and the candidate's political party), the nominating petition must include an oath accepted by persons who sign the petition.  Minn. Stat. § 204B.07, subd. 1, 4.  The required oath reads: "I solemnly swear (or affirm) that I know the contents and purpose of this petition, that I do not intend to vote at the primary election for the office for which this nominating petition is made, and that I signed this petition of my own free will."  *Id.* § 204B.07, subd. 4.  The governing statute also provides: "An individual who, in signing a nominating petition, makes a false oath is guilty of perjury," and perjury is punishable by of up to five years in prison, a fine of up to $10,000, or both.  *Id.* § 204B.07, subd. 6; *id.* § 609.48.  "This Court has interpreted the oath to refer only to a voter's present intention regarding voting in the primary and as thus not barring a voter from voting in the primary after changing their mind."  Compl. ¶ 51 (citing *Libertarian Party of Minn. v.*

*Simon*, 463 F. Supp. 3d 936, 941 (D. Minn. 2020), *aff'd*, No. 20-2244, 2021 WL 4026159 (8th Cir. Sept. 3, 2021), *cert. denied*, 142 S. Ct. 780 (2022)); *see also* Fuehrer Decl. ¶ 31.

This year, the Party and McTavish plan to pursue McTavish's candidacy for Minnesota governor by nominating petition and to have Party members and other volunteers solicit the necessary signatures. Compl. ¶¶ 20–21, 28, 54, 56–57; McTavish Decl. ¶¶ 8–9; Fuehrer Decl. ¶¶ 17–19, 23, 25–26. To do this, "[t]he party recruits volunteers to solicit signatures, and the party trains candidates and volunteers on soliciting signatures. This training includes advice about how to answer questions about the oath required by Minn. Stat. § 204B.07, subd. 4." Compl. ¶ 57; Fuehrer Decl. ¶ 26.

The Party has used the nominating petition procedure in the past, sometimes successfully, sometimes not. These attempts include: a special election for the Minnesota House of Representatives in 2015, when the Party "failed to obtain the necessary signatures"; elections for Minnesota State Senate, U.S. House of Representatives, and U.S. President in 2016, when the Party succeeded in placing each of these candidates on the ballot; elections for Secretary of State and U.S. House of Representatives in 2018, both of which were successful; and elections for U.S. President, U.S. House of Representatives, and U.S. Senate in 2020, when only the nomination of the presidential candidate was successful. Compl. ¶¶ 18–19; Fuehrer Decl. ¶ 16.

The record contains some information about the Party's past signature-solicitation efforts vis-à-vis the challenged oath-acceptance requirement. Fuehrer has "solicited signatures for nominating petitions and [] answered voters' questions about the oath." Compl. ¶ 60; Fuehrer Decl. ¶ 27. Voters "often" ask Fuehrer or other signature-gatherers

4

about the oath "because it is so conspicuous on the nominating petition," and "[v]oters are sometimes reluctant or even unwilling to sign a nominating petition because of the oath requirement," a problem Fuehrer has encountered when soliciting signatures. Compl. ¶¶ 61–62; Fuehrer Decl. ¶¶ 28–29. "Some voters," including some Fuehrer has encountered, "are reluctant or unwilling to sign a petition because they are reluctant to give up the right to vote in the primary election." Compl. ¶ 63; Fuehrer Decl. ¶ 30.

Plaintiffs acknowledge that a signature-gatherer can explain "that a court has interpreted the oath to refer only to a voter's present intention regarding voting in the primary and that signing thus does not bar the voter from voting in the primary after changing their mind," but even if this explanation resolves the voter's fears, Plaintiffs allege that the need to explain "is itself a burden on" Fuehrer and other signature-gatherers. Compl. ¶ 64; Fuehrer Decl. ¶ 31. Plaintiffs allege that, since the window to collect signatures is short, "anything that takes up the time of the people soliciting signatures makes meeting the deadline harder." Compl. ¶ 65; Fuehrer Decl. ¶ 31.

"Some voters," including some Fuehrer has encountered, nonetheless "are reluctant or unwilling to sign a petition even after" having it explained that they can vote in a primary if they change their mind "because they do not trust it or still fear prosecution if they sign a petition and then vote in a primary," and some "are reluctant or unwilling to sign a petition regardless of their desire to vote in a primary because" doing so "necessarily entails some risk" of prosecution for perjury "on the theory that the voter, at the time of signing, did in fact intend to vote in the primary." Compl. ¶¶ 66–67; Fuehrer Decl. ¶¶ 32–33.

In the sole count of their Complaint, Plaintiffs claim that the oath requirement violates Plaintiffs' First Amendment right to expressive association because it "burdens the expressive-association rights of minor political parties, their members, and their candidates by deterring voters from signing nominating petitions and thus making it harder for candidates to obtain the requisite number of signatures for nomination." Compl. ¶¶ 69–70, 75; *see also id.* ¶¶ 2–3, 77–78 (alleging that the oath requirement "hampers Minnesotans' ability to cooperate in getting their preferred candidate on the ballot and thus getting their preferred candidate elected" and "hampers the organizing, operating, and campaigning of minor political parties"); Fuehrer Decl. ¶ 34 (asserting that "the oath requirement makes it harder for the party to obtain the nomination of its own candidates, and thus harder for the party to get its candidates on a ballot."). "And even if the oath requirement does not ultimately deter a voter from signing, the need to explain the requirement to a voter from whom a signature is sought does itself burden the expressive-association rights of minor political parties, their members, and their candidates." Compl. ¶ 76.

Plaintiffs do not allege that the challenged statute is being, or will be, applied differently to Plaintiffs than to other minor political parties or their candidates, and Plaintiffs ask that the Secretary be enjoined from enforcing the statute entirely. *See* ECF Nos. 4, 12 (motion and proposed order). Plaintiffs thus advance a facial challenge. Compl. ¶ 5, at 16 ¶ 1; *see also Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Mo.*, 923 F.3d 508, 509 n.2 (8th Cir. 2019) (concluding challenge was facial where relief sought reached beyond the plaintiff's particular circumstances).

II[3]

A preliminary injunction is an "extraordinary remedy." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted); *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). "In deciding whether to issue a preliminary injunction, the district court considers four factors: '(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest.'" *Sleep No. Corp. v. Young*, --- F.4th ---, No. 21-1784, 2022 WL 1481815, at *2 (8th Cir. May 11, 2022) (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc)). The core question is whether the equities "so favor[] the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113 (footnote omitted). "The burden of establishing the four factors lies with the party seeking injunctive relief." *CPI Card Grp., Inc. v. Dwyer*, 294 F. Supp. 3d 791, 807 (D. Minn. 2018) (citing *Watkins*, 346 F.3d at 844).

A

"While no single factor is determinative, the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (citations

---

[3] Plaintiffs filed their Complaint on May 5, 2022. ECF No. 1. Plaintiffs filed their motion for a preliminary injunction the next day. ECF No. 4. Absent a request or suggestion from Plaintiffs, a briefing and hearing order was issued *sua sponte* requiring the Secretary to respond to Plaintiffs' motion on or before May 12 and setting a hearing for May 16. ECF No. 10.

and internal quotation marks omitted); *Sleep No. Corp.*, 2022 WL 1481815, at *2. Although this factor uses the term "probability," the movant ordinarily need not show a greater than fifty percent likelihood of success. *Dwyer*, 294 F. Supp. 3d at 807. This case is different. Because Plaintiffs seek to enjoin a statute, they must demonstrate that it is more likely than not that they will prevail, a standard "reserved for injunctions against the enforcement of statutes and regulations, which are 'entitled to a higher degree of deference and should not be enjoined lightly.'" *Sleep No. Corp.*, 2022 WL 1481815, at *2 (quoting *Rodgers v. Bryant*, 942 F.3d 451, 455–56 (8th Cir. 2019)). "[T]he absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied[.]" *CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009).

Plaintiffs assert their facial challenge to the oath requirement under the *Anderson-Burdick* framework. Named for the cases from which the test is derived—*Anderson v. Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)—the *Anderson-Burdick* framework "require[s] that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality opinion) (cleaned up). "Where a statute imposes a severe burden on a plaintiff's rights, it must be 'narrowly tailored and advance a compelling state interest.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)). "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable,

8

nondiscriminatory restrictions." *Id.* (cleaned up). "A plaintiff seeking relief that would invalidate an election provision in all of its applications bears 'a heavy burden of persuasion[.]'" *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018) (quoting *Crawford*, 553 U.S. at 200).

1

The better answer at this stage is that the alleged burdens imposed by the challenged statute are not substantial and trigger less exacting review. This is so for several reasons.

(a) The primary problem Plaintiffs allege is that the oath-acceptance requirement causes would-be supporters not to sign petitions, but the comparatively limited record does not show that this occurs with any frequency. The Complaint's allegations and the testimony in the two declarations show only that "some" voters are reluctant or unwilling to sign because of the oath. Compl. ¶¶ 62–63, 66–67; Fuehrer Decl. ¶¶ 29–30, 32–33. "Some" could mean many things, and the record provides no specifics. There is, for example, no information showing a particular number or range of individuals who fall in this category. It is no doubt true, as Plaintiffs argue, that one vote can swing an election. But accepting that fact doesn't show that the statute's burden is severe. If that were enough, something close to every constitutional challenge to an election regulation would receive strict scrutiny.[4]

---

[4]      Identifying even a specific number of persons whose reluctance to sign a petition resulted from the oath wouldn't do the job. It's quite possible, for example, that some subset of these persons couldn't accept the oath because they intended to vote in a major-party primary.

(b) Plaintiffs allege that answering questions concerning the oath's meaning "takes up [] time," Compl. ¶ 65; Fuehrer Decl. ¶ 31, and that this diversion makes the task of obtaining the required signatures more burdensome.  This assertion lacks evidentiary support.  The record includes no evidence showing, for example, how often prospective signers ask about the oath, how such questions might be answered, or how long such discussions ordinarily might take as compared with other questions prospective signers (no doubt) ask.  This assertion also seems unsupported in light of what Plaintiffs admit it would take to answer questions about the oath's meaning.  At the hearing, Plaintiffs argued that the oath-acceptance requirement would in their view be constitutional if the statute included the following passage from *Libertarian Party of Minnesota*:

> In other words, the oath only requires signers to attest to a present intention not to vote in an upcoming primary.  Because the oath is expressly limited to the intent at the time of signature, it does not preclude signers from changing their minds thereafter and from voting in a later primary.  The petition therefore does not require signers to relinquish any right nor does it subject them to criminal prosecution if they vote in a subsequent primary.

463 F. Supp. 3d at 941.  In response to questions concerning the oath-acceptance requirement, Plaintiffs would be free to read or provide this same comforting information to would-be petition signers.  Relevant here, the burden that would impose on Plaintiffs would be minimal.

(c) The record does not show that the oath-acceptance requirement has burdened the Party by preventing its candidates from gathering the required number of signatures to appear on the ballot.  Plaintiffs describe nine attempts to get a Party candidate on the ballot

by nominating petition, and six of these were successful.  Innumerable factors could have been responsible for the Party's failures and successes.  The bottom line is that the failures, weighed against the successes, do not show that the oath requirement imposes a significant burden.  *Storer v. Brown*, 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not."); *compare Green Party of Ark. v. Martin*, 649 F.3d 675, 684 (8th Cir. 2011) (citing *Storer*) ("Although the Green Party argues that alternative parties have experienced hardships in achieving access to the ballot, the Green Party's success in securing ballot access as a new political party in 2006, 2008, and 2010 diminishes its own argument." (footnote omitted)), *with Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 402–04 (8th Cir. 2020) (applying strict scrutiny and affirming grant of emergency injunctive relief where district court concluded that petition regime for new political parties was likely unconstitutional given, among other reasons, evidence of party's past experience in being unable to meet the requirements and party officials' "clear[] testi[mony] that they would not be able to meet the requirements").  Here, the record includes only thinly described, largely conclusory allegations connecting the Party's ballot failures and the oath requirement.  *See, e.g.*, Compl. ¶¶ 2–3, 65, 75–76.

(d) To a great degree, accepting Plaintiffs' argument that the oath requirement imposes a severe burden in turn requires accepting that voters reasonably believe that signing a petition exposes them to a credible threat of prosecution.  The law and experience do not justify accepting this proposition.  Citizens are presumed to know the law—election law as much as any other.  *See Thomas v. Andino*, Nos. 3:20-cv-01552-JMC, 3:20-cv-

01730-JMC, 2020 WL 2617329, at *25 n.25 (D.S.C. May 25, 2020) ("It is reasonable to expect a voter, who is voting by absentee ballot, no matter the reason, to familiarize themselves with the rules governing that procedure—especially when those procedures are provided." (citing *Georgia v. Public.Resource.Org, Inc.*, --- U.S. ---, 140 S. Ct. 1498, 1507 (2020))); *see also State v. King*, 257 N.W.2d 693, 697–98 (Minn. 1977) ("All members of an ordered society are presumed either to know the law or, at least, to have acquainted themselves with those laws that are likely to affect their usual activities."). The challenged statute is not so vague or difficult-to-understand as to think an exception to this general rule is warranted here. If that weren't enough, Plaintiffs identify no example of a prosecution for a violation of the oath, much more an unwarranted prosecution.

(e) On this record, the burdens Plaintiffs allege seem less severe than restrictions the Supreme Court and Eighth Circuit have determined do not warrant strict scrutiny. *See Clingman v. Beaver*, 544 U.S. 581, 588–91 (2005) (describing as non-severe burden a law that prohibited a candidate from appearing on a ballot as a nominee for more than one party and concluding that law allowing only a party's own registered members and registered Independents to vote in the party's primary involved only minimal burdens); *Green Party of Ark.*, 649 F.3d at 685 (concluding that although burdens imposed by statute requiring winning a certain amount of votes for certain offices to maintain status as a certified political party, which was one way for candidates to access the ballot, were not trivial, they were not severe).

12

2

Because the oath requirement here imposes non-severe, lesser burdens, the state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Clingman*, 544 U.S. at 586–87 (quoting *Timmons*, 520 U.S. at 358); *accord Green Party of Ark.*, 649 F.3d at 685–86. Here, the Secretary says the State has an "interest in ensuring the integrity and reliability of election processes by requiring candidates to make a preliminary showing of substantial support to be placed on the ballot" and "in preventing distortion of the electoral process," and the oath requirement advances these interests. Def.'s Mem. in Opp'n at 5. It does so by "ensur[ing] that nominating-petition signatories do not intend (at least at the time of signature) to support a major-party candidate for the same office," which has two consequences. *Id.* It "makes ballots less cluttered with candidates who gather signatures from Minnesotans who intend to vote for someone else in a primary election." *Id.* "It also discourages a variant of 'party raiding,'" which involves voters who support a major-party candidate working to get a minor-party candidate on the ballot only for the purpose of drawing votes away from the opposing major-party candidate. *Id.* at 5–6.

There isn't much question these interests are sufficiently important. Ensuring the integrity of the election process by requiring a preliminary showing of support by a candidate and preventing distortion have been recognized as important regulatory interests. *See Anderson*, 460 U.S. at 788 n.9. Deterring "party raiding" also has been recognized as an important interest. *See, e.g.*, *Clingman*, 544 U.S. at 594 (citing *Storer*, 415 U.S. at 735); *Anderson*, 460 U.S. at 788 n.9; *De La Fuente v. Cortes*, 751 F. App'x 269, 274–75 (3d Cir.

2018); *S.D. Libertarian Party v. Gant*, 60 F. Supp. 3d 1043, 1051 (D.S.D. 2014).  The same may be said of the state's interests in avoiding "ballot overcrowding" and "frivolous candidacies."  *See Green Party of Ark.*, 649 F.3d at 686.

These important regulatory interests ordinarily would be enough to justify the oath requirement unless the requirement is unreasonable or is discriminatory.  There's nothing here to suggest the oath requirement is either.  Plaintiffs at times seem to suggest that there is some discriminatory element because the oath requirement only applies to the procedure for nominating petitions, which is only applicable to minor political parties.  *See* Compl. ¶¶ 2–3, 50.  This is unpersuasive for two reasons.  First, an election regime is not impermissibly discriminatory just because it treats minor parties differently from major parties.  *See Timmons*, 520 U.S. at 366–67 (discussing that states may not "completely insulate the two-party system from minor parties' or independent candidates' competition and influence" but also "need not remove all of the many hurdles third parties face in the American political arena today").  Second, the "differential burden" here, Compl. ¶ 3— that is, the different treatment each class of parties receives—is somewhat illusory, because Minnesota imposes a similar requirement on primary-election voters.  They are required to sign a roster stating that the voter "has not already voted in the election."  Minn. Stat. § 204C.10(a).  The roster must also state: "I understand that deliberately providing false information is a felony punishable by" up to five years in prison, a fine of up to $10,000, or both.  *Id.*  In view of these requirements, it is difficult to understand how the oath requirement in § 204B.07 could be considered discriminatory.  If anything, it creates a less restrictive regime for those participating in nominating a minor-political-party candidate

14

because—unlike the primary voter—a person who signs a petition may change her mind and vote again.  *See Libertarian Party of Minn.*, 463 F. Supp. 3d at 941.

Plaintiffs have not carried their burden to show that it is more likely than not they will succeed on the merits of this case.  Since likelihood of success on the merits is the most significant of the *Dataphase* factors, this factor weighs heavily in favor of denying the motion.

### B

The next factor is irreparable harm, which "occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."  *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009).  "The movant must show that 'irreparable injury is *likely* in the absence of an injunction,['] not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered."  *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (quoting *Winter*, 555 U.S. at 20).  "Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins Inc.*, 346 F.3d at 844; *see also Gamble v. Minn. State Indus.*, No. 16-cv-2720 (JRT/KMM), 2017 WL 6611570, at *2 (D. Minn. Dec. 1, 2017) (collecting cases).

The preceding discussion of the merits overlaps considerably with the question of irreparable harm.  Specifically, the same conclusions showing that the oath-acceptance requirement is not substantially burdensome show that Plaintiffs are not likely to suffer irreparable harm—or at least that Plaintiffs have not shown they face this risk.  There is more.  Though McTavish announced his candidacy April 7, this case was not filed, and

emergency relief not requested, until within two weeks of the signature-gathering period's start. "It has long been recognized that delay in seeking relief vitiates much of the force of allegations of irreparable harm." *Hum. Rts. Def. Ctr. v. Sherburne Cnty., Minn.*, No. 20-cv-1817 (ADM/HB), 2020 WL 7027840, at *6 (D. Minn. Nov. 30, 2020) (cleaned up) (quoting *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 894 (8th Cir. 2013)) (collecting cases denying preliminary injunctive relief where plaintiffs delayed). Here, Plaintiffs have introduced evidence to support their motion dating to 2015, meaning at least that the Party has known of the issues it raises here for several years. In other words, though Plaintiffs seem to say the oath requirement has created difficulties in past elections, they do not explain why they waited until just before this year's fourteen-day signature-gathering window to seek relief. Regardless, Plaintiffs have not carried their burden with respect to irreparable harm, and this factor weighs against granting relief.

C

The final two *Dataphase* factors also do not change things. The balance-of-harms factor "involves assessing the harm the movant would suffer absent an injunction, as well as the harm the other parties would experience if the injunction issued." *Prairie Field Servs., LLC v. Welsh*, 497 F. Supp. 3d 381, 404 (D. Minn. 2020) (cleaned up). Against Plaintiffs' lightly documented assertions, the Secretary says Minnesota would face harm if an injunction were to issue because the Secretary would "be precluded from applying [the State's] duly enacted legislation regarding election procedures," which, when a statute is not unconstitutional, has been recognized to be irreparable harm to a state. *Org. for Black*

16

*Struggle*, 978 F.3d at 609.  In other words, this factor favors the Secretary because the merits of Plaintiffs' constitutional claim favor the Secretary.

The public interest factor favors the Secretary.  As Plaintiffs point out, the public does have an interest in both expressive association generally and in being able to support a candidate without worrying about a perjury prosecution.  Pls.' Mem. Supp. [ECF No. 5] at 17.  Freedom of association, especially in the political context, is a most important public right.  But there is a countervailing interest in play—the interest in having election rules settled in the run-up to the election.  *See Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020) (per curiam) ("This Court has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election.") (collecting cases).  Here, today is (literally) the eve of the election given that the signature-gathering window opens tomorrow.  This factor favors the Secretary.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED THAT** Plaintiffs Independence-Alliance Party of Minnesota and Hugh McTavish's Motion for a Temporary Restraining Order and for a Preliminary Injunction [ECF No. 4] is **DENIED**.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  May 16, 2022                    s/ Eric C. Tostrud
                                        Eric C. Tostrud
                                        United States District Court

17