UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Independence-Alliance Party of Minnesota and Hugh McTavish,

      Plaintiffs,

v.

Steve Simon, *in his official capacity as the Minnesota secretary of state, or his successor*,

      Defendant.

File No. 22-cv-01231 (ECT/JFD)

**OPINION AND ORDER**

---

Erick G. Kaardal, Mohrman, Kaardal & Erickson, P.A., Minneapolis, MN, for Plaintiffs Independence-Alliance Party of Minnesota and Hugh McTavish.

Allen Barr, Office of the Minnesota Attorney General, St. Paul, MN, for Defendant Steve Simon.

---

In this § 1983 case, Plaintiffs Independence-Alliance Party of Minnesota and Hugh McTavish, an Independence-Alliance Party member and 2022 gubernatorial candidate, assert a First Amendment challenge to Minn. Stat. § 204B.07, subd. 4. This statute requires persons who sign a minor-party candidate's nominating petition to accept an oath attesting that they "do not intend to vote at the primary election for the office for which this nominating petition is made." Plaintiffs claim this requirement unlawfully burdens their First Amendment right to expressive association.

Defendant Steve Simon, the Minnesota Secretary of State, moves to dismiss Plaintiffs' Complaint under Federal Rule of Civil Procedure 12(b)(6). The Secretary

argues essentially that the challenged statute imposes an insubstantial burden, serves Minnesota's important regulatory interests, and therefore withstands review under the controlling *Anderson-Burdick* framework. The Secretary also argues that the Complaint's factual allegations do not plausibly undermine these legal conclusions. Plaintiffs do not meaningfully engage with the *Anderson-Burdick* framework. Citing different lines of authority, Plaintiffs argue essentially that the challenged statute fails strict scrutiny and is both unconstitutionally vague and absurd.

The Complaint will be dismissed. McTavish's claim will be dismissed for lack of subject-matter jurisdiction because his claim is moot. Public records show that McTavish obtained the required signatures, submitted a nominating petition, and appeared on the November 2022 gubernatorial ballot. And the Complaint includes no allegations showing that McTavish has a reasonable expectation that he will be subject again to the challenged statute. The Party's claim will be dismissed under Rule 12(b)(6) because the Complaint's allegations do not plausibly show that the statute might fail scrutiny under the *Anderson-Burdick* framework.

I[1]

Plaintiff Independence-Alliance Party of Minnesota is a minor political party in Minnesota as defined in Minn. Stat. § 200.02, subd. 23. Compl. [ECF No. 1] ¶¶ 4, 8–9. The Party "has run at least one candidate for partisan office in each Minnesota general

---

[1]    The facts are draw entirely from the Complaint or from public records and materials embraced by the Complaint. *See C.H. Robinson Worldwide, Inc. v. Lobrano*, 695 F.3d 758, 764 (8th Cir. 2012).

election since 1994," though the Party held "major political party" status from January 1995 through December 2014. *Id.* ¶¶ 10, 16; *see also* Minn. Stat. § 200.02, subd. 7 (defining "major political party"). Philip Fuehrer is the Independence-Alliance Party's chair, and he has held this position since November 2015. Compl. ¶¶ 58–59.

Plaintiff Hugh McTavish lives in Washington County, Minnesota, and is a Party member. *Id.* ¶¶ 23–24. The Complaint includes the allegation that McTavish planned to run for Minnesota governor this year as the Party's nominee, and the Party planned to support McTavish's candidacy. *Id.* ¶¶ 20–22, 25–28. Plaintiffs acknowledge, and public records confirm, that "McTavish did eventually obtain the necessary threshold for the 2022 general election as a minor-political party Independence Party candidate for governor." Pls.' Mem. in Opp'n [ECF No. 24] at 25 n.10; *see also* Off. of the Minn. Sec'y of State Steve Simon, 2022 General Election Results (showing votes for governor), https://www.sos.state.mn.us/elections-voting/election-results/2022/2022-general-election-results/ (last visited December 19, 2022).

In Minnesota, the process for nominating major political party candidates differs from the process for minor political party candidates. Compl. ¶¶ 2, 43. Generally speaking, candidates of major political parties are nominated by primaries, while candidates of minor political parties, like McTavish, are "nominated by nominating petition as provided in sections 204B.07 and 204B.08." Minn. Stat. § 204B.03. The nominating-petition process involves obtaining a required minimum number of signatures on a nominating petition (the number varies depending on the office sought) and timely submitting the petition to the Minnesota Secretary of State. *See id.* §§ 204B.08, 204B.09.

A minor-party candidate has a fourteen-day window to collect signatures on a nominating petition and to submit the petition. *Id.* § 204B.09, subd. 1. By statute, the fourteen-day window must occur "not more than 84 days nor less than 70 days before the state primary," and for the 2022 election, this fourteen-day period runs from May 17 to May 31, 2022. *Id.* § 204B.09, subd. 1(a); Compl. ¶ 53.

Among other required information (including, for example, the office sought, the candidate's name and address, and the candidate's political party), the nominating petition must include an oath accepted by persons who sign the petition. Minn. Stat. § 204B.07, subd. 1, 4. The required oath reads: "I solemnly swear (or affirm) that I know the contents and purpose of this petition, that I do not intend to vote at the primary election for the office for which this nominating petition is made, and that I signed this petition of my own free will." *Id.* § 204B.07, subd. 4. The governing statute also provides: "An individual who, in signing a nominating petition, makes a false oath is guilty of perjury," and perjury is punishable by of up to five years in prison, a fine of up to $10,000, or both. *Id.* § 204B.07, subd. 6; *id.* § 609.48. "This Court has interpreted the oath to refer only to a voter's present intention regarding voting in the primary and as thus not barring a voter from voting in the primary after changing their mind." Compl. ¶ 51 (citing *Libertarian Party of Minn. v. Simon*, 463 F. Supp. 3d 936, 941 (D. Minn. 2020), *aff'd*, No. 20-2244, 2021 WL 4026159 (8th Cir. Sept. 3, 2021), *cert. denied*, 142 S. Ct. 780 (2022)).

At the time the Complaint was filed, the Party and McTavish planned to pursue McTavish's candidacy for Minnesota governor in the 2022 general election by nominating petition and to have Party members and other volunteers solicit the necessary signatures.

4

Compl. ¶¶ 20–21, 28, 54, 56–57.  To do this, "[t]he party recruits volunteers to solicit signatures, and the party trains candidates and volunteers on soliciting signatures.  This training includes advice about how to answer questions about the oath required by Minn. Stat. § 204B.07, subd. 4."  Compl. ¶ 57.

The Party has used the nominating petition procedure in the past, sometimes successfully, sometimes not.  These attempts include: a special election for the Minnesota House of Representatives in 2015, when the Party "failed to obtain the necessary signatures"; elections for Minnesota State Senate, U.S. House of Representatives, and U.S. President in 2016, when the Party succeeded in placing each of these candidates on the ballot; elections for Secretary of State and U.S. House of Representatives in 2018, both of which were successful; and elections for U.S. President, U.S. House of Representatives, and U.S. Senate in 2020, when only the nomination of the presidential candidate was successful.  *Id.* ¶¶ 18–19.

The Complaint includes some allegations about the Party's past signature-solicitation efforts vis-à-vis the challenged oath-acceptance requirement.  Fuehrer has "solicited signatures for nominating petitions and [] answered voters' questions about the oath."  *Id.* ¶ 60.  Voters "often" ask Fuehrer or other signature-gatherers about the oath "because it is so conspicuous on the nominating petition," and "[v]oters are sometimes reluctant or even unwilling to sign a nominating petition because of the oath requirement," a problem Fuehrer has encountered when soliciting signatures. *Id.* ¶¶ 61–62.  "Some voters are reluctant or unwilling to sign a petition because they are reluctant to give up the right to vote in the primary election."  *Id.* ¶ 63.

Plaintiffs acknowledge that a signature-gatherer can explain "that a court has interpreted the oath to refer only to a voter's present intention regarding voting in the primary and that signing thus does not bar the voter from voting in the primary after changing their mind," but even if this explanation resolves the voter's fears, Plaintiffs allege that the need to explain "is itself a burden on" Fuehrer and other signature-gatherers. *Id.* ¶ 64. Plaintiffs allege that, since the window to collect signatures is short, "anything that takes up the time of the people soliciting signatures makes meeting the deadline harder." *Id.* ¶ 65.

"Some voters are reluctant or unwilling to sign a petition even after" having it explained that they can vote in a primary if they change their mind "because they do not trust it or still fear prosecution if they sign a petition and then vote in a primary," and some "are reluctant or unwilling to sign a petition regardless of their desire to vote in a primary because" doing so "necessarily entails some risk" of prosecution for perjury "on the theory that the voter, at the time of signing, did in fact intend to vote in the primary." *Id.* ¶¶ 66–67.

In the sole count of their Complaint, Plaintiffs claim that the oath requirement violates Plaintiffs' First Amendment right to expressive association because it "burdens the expressive-association rights of minor political parties, their members, and their candidates by deterring voters from signing nominating petitions and thus making it harder for candidates to obtain the requisite number of signatures for nomination." *Id.* ¶¶ 69–70, 75; *see also id.* ¶¶ 2–3, 77–78 (alleging that the oath requirement "hampers Minnesotans' ability to cooperate in getting their preferred candidate on the ballot and thus getting their

preferred candidate elected" and "hampers the organizing, operating, and campaigning of minor political parties"). "And even if the oath requirement does not ultimately deter a voter from signing, the need to explain the requirement to a voter from whom a signature is sought does itself burden the expressive-association rights of minor political parties, their members, and their candidates." *Id.* ¶ 76. Plaintiffs do not allege that the challenged statute is being, or will be, applied differently to Plaintiffs than to other minor political parties or their candidates, and Plaintiffs ask that the Secretary be enjoined from enforcing the statute entirely. Plaintiffs thus advance a facial challenge. *Id.* ¶ 5, at 16 ¶ 1; *see also Free the Nipple - Springfield Residents Promoting Equal. v. City of Springfield, Mo.*, 923 F.3d 508, 509 n.2 (8th Cir. 2019) (concluding challenge was facial where relief sought reached beyond the plaintiff's particular circumstances).

The opening stages of this case occurred just before and during the fourteen-day window for collecting signatures on and submitting a nominating petition. The Complaint was filed on May 5, 2022. ECF No. 1. Plaintiffs filed a motion for a temporary restraining order and preliminary injunction on May 6, and that motion was denied in an Opinion and Order dated May 16. ECF Nos. 4, 16; *see Independence-Alliance Party of Minn. v. Simon*, --- F. Supp. 3d ---, No. 22-cv-1231 (ECT/JFD), 2022 WL 1537985 (D. Minn. May 16, 2022). The Secretary then moved to dismiss. ECF No. 18.

II

The fact that McTavish was successful in collecting the required signatures and submitting a nominating petition raises the jurisdictional question of whether his claim is moot. The United States Constitution limits the subject-matter jurisdiction of federal courts

7

to ongoing cases and controversies.  *See* U.S. Const. art. III, § 2, cl. 1.  "Therefore, the plaintiff's standing to sue 'is the threshold question in every federal case, determining the power of the court to entertain the suit.'"  *Steger v. Franco, Inc.*, 228 F.3d 889, 892 (8th Cir. 2000) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).  "To show Article III standing, a plaintiff has the burden of proving: (1) that he or she suffered an 'injury-in-fact,' (2) a causal relationship between the injury and the challenged conduct, and (3) that the injury will likely be redressed by a favorable decision."  *Id.* (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  "[S]tanding is based on the facts as they existed at the time the lawsuit was filed," *id.* at 893, but it must exist "through all stages of the litigation," not just "at the time the complaint is filed," *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (cleaned up).  "When, during the course of litigation, the issues presented in a case 'lose their life because of the passage of time or a change in circumstances . . . and a federal court can no longer grant effective relief,' the case is considered moot."  *Ali v. Cangemi*, 419 F.3d 722, 723 (8th Cir. 2005) (quoting *Haden v. Pelofsky*, 212 F.3d 466, 469 (8th Cir. 2000)); *see Already LLC*, 568 U.S. at 91; *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–05, 107 n.8 (1983) (holding that a plaintiff possesses standing to seek prospective injunctive and declaratory relief only when she faces an ongoing injury or a "real and immediate" threat of future injury).  If an action is moot because it no longer satisfies the case-or-controversy requirement, a federal court "ha[s] no discretion and must dismiss the action for lack of jurisdiction."  *Ali*, 419 F.3d at 724 (citing *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969)).

8

Here, McTavish's claim is moot, and he no longer has standing.  The challenged statute no longer applies to his candidacy, as the time for collecting signatures and submitting a petition has passed.  And the Complaint includes allegations plausibly showing only that McTavish planned to seek the Party's nomination "in the 2022 Minnesota gubernatorial election."  Compl. ¶ 28; *see also id.* ¶¶ 20–24, 26–27 (limiting McTavish's specific intentions to the 2022 gubernatorial nomination).  It is true that the Complaint includes the quite-broad allegation that "[McTavish] is a potential future Independence-Alliance Party candidate for office."  *Id.* ¶ 25.  It is not clear whether this allegation is intended to describe McTavish's intention to seek some other office at some future date.  Regardless, allegations like this that express vague, "'some day' intentions— without any description of concrete plans, or indeed even any specification of *when* that some day will be—do not support a finding of the 'actual or imminent" injury that [the Supreme Court's] cases require."  *Lujan*, 504 U.S. at 564.  Because McTavish's individual claim is moot, it follows that the Party's claim—at least to the extent it relies on McTavish's 2022 gubernatorial candidacy—also is moot.

There is an exception to mootness, which Plaintiffs say their claims fit.  *See* Pls.' Mem. in Opp'n at 25 n.10.  "Under [the capable-of-repetition-yet-evading-review exception to mootness], a case that would otherwise be moot is not if '(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party [will] be subjected to the same action again.'"  *Whitfield v. Thurston*, 3 F.4th 1045, 1047 (8th Cir. 2021) (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).  "Election issues are

among those most frequently saved from mootness by this exception." *Missourians for Fiscal Accountability v. Klahr*, 830 F.3d 789, 795 (8th Cir. 2016) (quoting *Nat'l Right to Life Pol. Action Comm. v. Connor*, 323 F.3d 684, 691 (8th Cir. 2003)); *see also Benezet Consulting, LLC v. Boockvar*, 433 F. Supp. 3d 670, 684 (M.D. Pa. 2020) ("[T]he exception to mootness in instances where conduct is capable of repetition but evading review 'readily applies to most election cases.'") (citation omitted). "As the party invoking the exception, [Plaintiffs] bear[] the burden of demonstrating that it applies." *Whitfield*, 3 F.4th at 1047 (citation omitted).

This exception does not save McTavish's claim. This is because the same-complaining-party requirement dictates that McTavish must "demonstrate a reasonable expectation that he will be subject to the challenged laws again." *Whitfield*, 3 F.4th at 1047–48 (discussing that while older Eighth Circuit and Supreme Court cases held that election cases fell within the capable-of-repetition-yet-evading-review exception without applying the same-complaining-party requirement, more recent precedent dictates applying the same-complaining-party requirement in election cases). "[McTavish] has not shown that *he* is reasonably likely to be subject to the challenged statutory provisions again," *Whitfield*, 3 F.4th at 1047, so he lacks Article III standing, and there is not subject-matter jurisdiction over his claim.

For the Party, however, this case fits the capable-of-repetition-yet-evading-review exception to mootness. Though some allegations in the Complaint are directed specifically at the 2022 gubernatorial election and McTavish's candidacy, there are enough allegations about the oath requirement and the Party's efforts to get candidates on the ballot generally

that it seems fair to say that for the Party, the case is about more than the 2022 election. *See, e.g.*, Compl. ¶¶ 1–5, 56–57.   The allegations showing the Party's consistent participation in elections over the years—it "has run at least one candidate for partisan office in each Minnesota general election since 1994"—especially support this conclusion. *Id.* ¶ 10; *see also id.* ¶¶ 18–22 (alleging ten attempts, including McTavish, to use the nominating petition process in just the last seven years).   Further, the allegations in the claim itself are not specific to McTavish and are about the oath requirement generally, *see id.* ¶¶ 69–81, and the relief requested would affect all elections and the enforceability of the oath-requirement statute, *id.* at 16.   The Party, therefore, plausibly alleges its standing.

III

In reviewing a motion to dismiss for failure to state a claim under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.   *Gorog v. Best Buy Co.*, 760 F.3d 787, 792 (8th Cir. 2014).   Although the factual allegations need not be detailed, they must be sufficient to "raise a right to relief above the speculative level."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).   The complaint must "state a claim to relief that is plausible on its face." *Id.* at 570.   "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

A

The Party's facial challenge to the oath requirement is assessed under the *Anderson-Burdick* framework.   Named for the cases from which the test is derived—*Anderson v.*

11

*Celebrezze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)—the *Anderson-Burdick* framework "require[s] that a court evaluating a constitutional challenge to an election regulation weigh the asserted injury to the right to vote against the precise interests put forward by the State as justifications for the burden imposed by its rule." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 190 (2008) (plurality opinion) (cleaned up).  "Where a statute imposes a severe burden on a plaintiff's rights, it must be 'narrowly tailored and advance a compelling state interest.'" *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).  "Lesser burdens, however, trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."  *Id.* (cleaned up).  "A plaintiff seeking relief that would invalidate an election provision in all of its applications bears 'a heavy burden of persuasion.'"  *Brakebill v. Jaeger*, 905 F.3d 553, 558 (8th Cir. 2018) (quoting *Crawford*, 553 U.S. at 200).[2]

---

[2]     The Party argues that "a law imposing a pre-requirement for a party or candidate to appear on an election ballot is subject to strict scrutiny as a burden on the right to expressive association."  Pls.' Mem. in Opp'n at 9.  To support this argument, the Party cites *Anderson*, but also several expressive-association cases outside the election-regulation context.  *See id.* (citing, for example, *Boy Scouts of Am. v. Dale*, 530 U.S. 640 (2000), and *Roberts v. United States Jaycees*, 468 U.S. 609 (1984)).  *Anderson* does not support the idea that *every* election regulation imposing ballot-qualification requirements on potential candidates is subject to strict scrutiny.  *Anderson* requires essentially that an election regulation be reviewed with deference proportionate to the burden the regulation imposes.  *See Org. for Black Struggle*, 978 F.3d at 607.  And it would not be faithful to *Anderson-Burdick* (or other binding Supreme Court and Eighth Circuit precedents applying *Anderson-Burdick*) to evaluate the Party's constitutional challenge under the standards applied in the non-election expressive-association cases the Party cites.

1

At most, the Complaint's allegations plausibly show that the challenged statute imposes insubstantial burdens that trigger less exacting review. This is so for several reasons.

(a) The primary problem the Party alleges is that the oath requirement causes would-be supporters not to sign petitions, but the Complaint's allegations do not plausibly show that this occurs with any meaningful frequency due to burden the requirement imposes. The Complaint alleges only that "[s]ome voters" are reluctant or unwilling to sign because of the oath. Compl. ¶¶ 62–63, 66–67. "Some" could mean many things, and the Complaint provides no specifics. There are, for example, no allegations showing a number or range of individuals who fall in this category.[3] Further, for the purpose of assessing the challenged statute's burden on voters, it is difficult to separate a voter's reluctance to sign a petition because of the oath-acceptance requirement from the reason or reasons underlying the voter's reluctance. What if, for example, a voter refused to sign because she intended to vote in a major-party primary? In that circumstance, it isn't really the burden imposed by the oath-acceptance requirement but its substance (and the voter's exercise of her associational rights) that prompted the voter not to accept the oath. On this particular point, the Complaint alleges that some are reluctant or unwilling to sign "because they are reluctant to give up the right to vote in the primary election." Compl. ¶ 63. But

---

[3]     It is no doubt true that one vote can swing an election. But accepting that fact doesn't show that the statute's burden is severe. If that were enough, something close to every constitutional challenge to an election regulation would receive strict scrutiny.

the Party does not argue that all voters have a right to both sign a nominating petition *and* vote in a primary.  At the hearings on the preliminary injunction motion and this motion, the Party took the position that a complete prohibition on doing just that would be permissible.

(b) The Party alleges that answering questions concerning the oath's meaning "takes up [] time," Compl. ¶ 65, and that this diversion makes the task of obtaining the required signatures more burdensome.  But this assertion does not plausibly show that the oath requirement imposes a substantial burden.  The Complaint includes no allegations showing, for example, how often prospective signers ask about the oath, how such questions might be answered, or how long such discussions ordinarily might take as compared with other questions prospective signers (no doubt) ask.  And the idea that the time required to answer questions about the oath is substantial would seem implausible in light of what the Party has admitted it would take to answer questions about the oath's meaning. At the preliminary injunction hearing, the Party and McTavish argued that the oath requirement would in their view be constitutional if the statute included the following passage from *Libertarian Party of Minnesota*:

> In other words, the oath only requires signers to attest to a present intention not to vote in an upcoming primary.  Because the oath is expressly limited to the intent at the time of signature, it does not preclude signers from changing their minds thereafter and from voting in a later primary.  The petition therefore does not require signers to relinquish any right nor does it subject them to criminal prosecution if they vote in a subsequent primary.

14

463 F. Supp. 3d at 941.  The Complaint itself alleges an even more succinct statement of the oath's meaning: that the oath "refer[s] only to a voter's present intention regarding voting in the primary and as thus [does] not bar[] a voter from voting in the primary after changing their mind."  Compl. ¶ 51 (citing *Libertarian Party of Minn.*, 463 F. Supp. 3d at 941).  In response to questions concerning the oath requirement, the Party would be free to read or provide this same information to would-be petition signers.  It is difficult to envision how reading either the case's passage verbatim or the more succinct summary version alleged in the Complaint would impose a substantial burden.

(c)  The Complaint does not plausibly show that the oath requirement has substantially burdened the Party by preventing its candidates from gathering the required number of signatures to appear on the ballot.  The Complaint describes ten attempts to get a Party candidate on the ballot by nominating petition (including McTavish's 2022 gubernatorial attempt), and seven of these were successful.  Innumerable factors could have been responsible for the Party's failures and successes.  The Complaint includes only thinly described, largely conclusory allegations connecting the Party's ballot failures to the oath requirement.  *See, e.g.*, Compl. ¶¶ 2–3, 65, 75–76.  And the Party's failures, weighed against its successes, do not plausibly show either that the oath requirement is to blame even in part for the Party's three failures or—more to the point—that the requirement imposes a significant burden.  *Storer v. Brown*, 415 U.S. 724, 742 (1974) ("Past experience will be a helpful, if not always an unerring, guide: it will be one thing if independent candidates have qualified with some regularity and quite a different matter if they have not."); *compare Green Party of Ark. v. Martin*, 649 F.3d 675, 684 (8th Cir.

2011) (citing *Storer*) ("Although the Green Party argues that alternative parties have experienced hardships in achieving access to the ballot, the Green Party's success in securing ballot access as a new political party in 2006, 2008, and 2010 diminishes its own argument." (footnote omitted)), *with Libertarian Party of Ark. v. Thurston*, 962 F.3d 390, 402–04 (8th Cir. 2020) (applying strict scrutiny and affirming grant of emergency injunctive relief where district court concluded that petition regime for new political parties was likely unconstitutional given, among other reasons, evidence of party's past experience in being unable to meet the requirements and party officials' "clear[ ] testi[mony] that they would not be able to meet the requirements").

(d) The Complaint alleges that the oath requirement imposes a substantial burden because some voters fear "that they will risk prosecution . . . because they can be accused of having lied under oath about their intention."  Compl. ¶ 1; *see also id.* ¶¶ 66–67. Accepting this allegation requires accepting that voters reasonably believe that signing a petition exposes them to a credible threat of prosecution, but this is implausible.  The law and experience do not justify accepting this proposition.  Citizens are presumed to know the law—election law as much as any other.  *See Thomas v. Andino*, --- F. Supp. 3d ---, Nos. 3:20-cv-01552-JMC, 3:20-cv-01730-JMC, 2020 WL 2617329, at *25 n.25 (D.S.C. May 25, 2020) ("It is reasonable to expect a voter, who is voting by absentee ballot, no matter the reason, to familiarize themselves with the rules governing that procedure— especially when those procedures are provided." (citing *Georgia v. Public.Resource.Org, Inc.*, --- U.S. ---, 140 S. Ct. 1498, 1507 (2020))); *see also State v. King*, 257 N.W.2d 693, 697–98 (Minn. 1977) ("All members of an ordered society are presumed either to know

16

the law or, at least, to have acquainted themselves with those laws that are likely to affect their usual activities."). The challenged statute is not so vague or difficult-to-understand as to think an exception to this general rule is warranted here.[4] If that weren't enough, the Party alleges no example of a prosecution for a violation of the oath, much more an unwarranted prosecution.

(e) Finally, the burdens alleged in the Complaint are less severe than restrictions the Supreme Court and Eighth Circuit have determined do not warrant strict scrutiny. *See Clingman v. Beaver*, 544 U.S. 581, 588–91 (2005) (describing as non-severe burden a law that prohibited a candidate from appearing on a ballot as a nominee for more than one party and concluding that law allowing only a party's own registered members and registered Independents to vote in the party's primary involved only minimal burdens); *Green Party of Ark.*, 649 F.3d at 685 (concluding that although burdens imposed by statute requiring winning a certain amount of votes for certain offices to maintain status as a certified political party, which was one way for candidates to access the ballot, were not trivial, they were not severe).

To summarize, the Party has not alleged facts in its Complaint plausibly showing that the burdens imposed by the oath requirement are severe. The Complaint's allegations,

---

[4]     The Party argues that the oath requirement "is subject to a void for vagueness challenge." Pls.' Mem. in Opp'n at 18; *see id.* at 11–21. As I understand it, this argument depends on the conclusion that a reasonable voter may understand the oath to mean that "she is giving up the right to exercise the franchise at a future major-political party primary." *Id.* at 15. The Complaint includes no mention of a void-for-vagueness challenge. Regardless, neither the challenged statute's text, nor any authority the Party has cited, support the conclusion that the oath-acceptance requirement is plausibly susceptible to a void-for-vagueness challenge.

17

with all reasonable inferences drawn in the Party's favor, at most show that the requirement imposes non-severe, lesser burdens.

2

Because the Party has plausibly alleged at most that the oath requirement imposes non-severe, lesser burdens, the state's "important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." *Clingman*, 544 U.S. at 586–87 (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)); *accord Green Party of Ark.*, 649 F.3d at 685–86.

Here, the Secretary says the State has an "interest in ensuring the integrity and reliability of election processes by requiring candidates to make a preliminary showing of substantial support to be placed on the ballot" and "in preventing distortion of the electoral process," and, the Secretary argues, the oath-acceptance requirement advances these interests. Def.'s Mem. in Supp. [ECF No. 20] at 8. It does so by "ensur[ing] that nominating-petition signatories do not intend (at least at the time of signature) to support a major-party candidate for the same office," which has two consequences. *Id.* It "makes ballots less cluttered with candidates who gather signatures from Minnesotans who intend to vote for someone else in a primary election." *Id.* "It also discourages a variant of 'party raiding,'" which involves voters who support a major-party candidate working to get a minor-party candidate on the ballot only for the purpose of drawing votes away from the opposing major-party candidate. *Id.* at 8–9.

There isn't much question these interests are sufficiently important. Ensuring the integrity of the election process by requiring a preliminary showing of support by a

candidate and preventing distortion have been recognized as important regulatory interests. *See Anderson*, 460 U.S. at 788 n.9. Deterring "party raiding" also has been recognized as an important interest. *See, e.g.*, *Clingman*, 544 U.S. at 594 (citing *Storer*, 415 U.S. at 735); *Anderson*, 460 U.S. at 788 n.9; *De La Fuente v. Cortes*, 751 F. App'x 269, 274–75 (3d Cir. 2018); *S.D. Libertarian Party v. Gant*, 60 F. Supp. 3d 1043, 1051 (D.S.D. 2014). The same may be said of the state's interests in avoiding "ballot overcrowding" and "frivolous candidacies." *See Green Party of Ark.*, 649 F.3d at 686.

These important regulatory interests ordinarily would be enough to justify the oath requirement unless the requirement is unreasonable or is discriminatory. The Complaint includes no allegations plausibly suggesting that the oath requirement is either.

The Party argues that the oath is unreasonable because it serves no purpose, but this argument is not persuasive. The gist of this argument is that, if a petition signer who accepts the oath may change her mind (even very shortly after signing) and vote in a primary, then the oath serves no purpose. If one concedes—as the Party has—that the oath would be constitutional if it prohibited petition signers from voting in a primary, then it is difficult to understand how § 204B.07, subd. 4's less rigid, more nuanced approach might cause the Party greater harm or be unconstitutional. As compared with an outright ban prohibiting petition signers from primary voting, the oath requirement strikes a balance that serves the interests of all concerned—the Party, voters, and the State. It seems reasonable for the legislature to have presumed that the Party would benefit from this approach because voters, knowing that they are able to change their mind, should be more willing to sign a petition than if they faced a primary-voting ban. Voters benefit because

they are required to attest to their present intentions—an advantage given the lag between the petition-signing period and the primaries. The State benefits for the reasons discussed earlier—by ensuring the integrity and reliability of its election processes. Importantly, the Complaint includes no allegations plausibly undermining these rational, common-sense conclusions.

The Party at times also seems to suggest that there is some discriminatory element because the oath requirement only applies to the procedure for nominating petitions, which is only applicable to minor political parties. *See* Compl. ¶¶ 2–3, 50. This is unpersuasive for two reasons. First, an election regime is not impermissibly discriminatory just because it treats minor parties differently from major parties. *See Timmons*, 520 U.S. at 366–67 (discussing that states may not "completely insulate the two-party system from minor parties' or independent candidates' competition and influence" but also "need not remove all of the many hurdles third parties face in the American political arena today"). Second, the "differential burden" here, Compl. ¶ 3—that is, the different treatment each class of parties receives—is somewhat illusory, because Minnesota imposes a similar requirement on primary-election voters. They are required to sign a roster stating that the voter "has not already voted in the election." Minn. Stat. § 204C.10(a). The roster must also state: "I understand that deliberately providing false information is a felony punishable by" up to five years in prison, a fine of up to $10,000, or both. *Id.* In view of these requirements, it is difficult to understand how the oath requirement in § 204B.07 could be considered discriminatory. If anything, as noted, it creates a less restrictive regime for those participating in nominating a minor-political-party candidate because—unlike the primary

voter—a person who signs a petition may change her mind and vote again. *See Libertarian Party of Minn.*, 463 F. Supp. 3d at 941.[5]

## ORDER

Based on the foregoing, and on all the files, records, and proceedings herein, **IT IS ORDERED THAT**:

1.    Defendant Secretary of State Steve Simon's Motion to Dismiss [ECF No. 18] is **GRANTED**.

2.    With respect to Plaintiff Hugh McTavish, the Complaint is **DISMISSED WITHOUT PREJUDICE** for lack of subject-matter jurisdiction.

3.    With respect to Plaintiff Independence-Alliance Party of Minnesota, the Complaint is **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted.

### LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  December 19, 2022                     s/ Eric C. Tostrud
                                             Eric C. Tostrud
                                             United States District Court

---

[5]    The Party has not requested an opportunity to amend the Complaint to address deficiencies identified in the Secretary's motion.  Therefore, with respect to the Party, the Complaint will be dismissed with prejudice.